IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

William M. Belegrin, Jr.,                  Case No. 3:09CV1700

        Plaintiff

    v.                                               ORDER

Commissioner of Social Security,

        Defendant

In this appeal, I review defendant Commissioner of Social Security's (Commissioner) final decision denying plaintiff William M. Belegrin, Jr.'s claims for disability insurance benefits (DIB) under Title II of the Social Security Act (SSA), 42 U.S.C. §§ 416(i) and 423. Jurisdiction is proper under 28 U.S.C. § 1331 and 42 U.S.C. § 405(g).

Belegrin objects [Doc. 21] to the Magistrate Judge's Report and Recommendation (Magistrate's Report) [Doc. 20] which recommends affirming the administrative law judge's (ALJ) decision. Based on a de novo review of the record, I overrule Belegrin's objections and adopt the Magistrate's Report.

**Procedural History**

Belegrin filed an application for DIB on July 8, 2003, with an alleged disability onset date of March 1, 2003. The Social Security Administration denied Belegrin's claim both initially and on

reconsideration. ALJ Bryan Bernstein held a hearing on August 17, 2005, and denied Belegrin's application on December 5, 2006.

On September 28, 2007, the Social Security Administration Office of Hearing and Appeals granted Belegrin's request for review, remanding the case to the ALJ, in part because the ALJ's opinion did not adequately address the medical source statements in the record.

On August 21, 2008, the ALJ held a second hearing, where he heard testimony from a vocational expert (VE), and Belegrin, who was represented by counsel. The ALJ denied Belegrin's application on October 28, 2008. Belegrin appeale. On March 16, 2009, the Social Security Administration Office of Hearing and Appeals denied Belegrin's request for review, thereby rendering the ALJ's 2008 decision the final judgment of the Commissioner.

Belegrin then sought judicial review of the Commissioner's decision. On August 23, 2010, Magistrate Judge Limbert issued a Report and Recommendation recommending that I affirm the Commissioner's decision. Belegrin objects to the limited weight the ALJ gave the medical opinions of Dr. Sherman and Dr. Deardorff, and his interpretation of the VE's testimony.

**Medical History**

Belegrin is a high-school-educated individual who previously worked as a bricklayer. In his 2003 application for disability, he alleged shortness of breath, coronary artery disease, chest pain, an abnormal heart, hyperdectomy and hyperlipidemia. However, Belegrin's objections focus on the ALJ's analysis of his mental condition, and so I limit my recital of his medical history to the facts necessary for review. Belegrin filed a second application for disability in 2007, which was determined to be a duplicate and was associated into the first claim. He was forty-one years old at

the time of his alleged disability onset, and forty-seven years old at the time of the ALJ's second decision.

## I. History Before Disability Claim

Belegrin has a history of depression and anxiety. Belegrin was taking Zoloft for depression as early as September, 1999. [R. at 31].

On March 7, 2003, Belegrin visited his primary care physician, Dr. Ware, who diagnosed chest pain and an upper respiratory infection. After experiencing some chest discomfort in May, 2003, Belegrin consulted with Dr. Welch, a cardiologist, who diagnosed "some inferior infarct with a small area of peri-infarct inferior wall ischemia." [R. at 324]. Dr. Welch noted that the test could be a false positive, but that Belegrin presented multiple risk factors such as obesity, hypertension, tobacco use and hyperlipidemia. Dr. Welch performed a catheterization and diagnosed coronary artery disease. On June 12, 2003, Dr. Welch gave him permission to return to bricklaying on a trial basis, though Dr. Welch understood that bricklaying "requires very heavy lifting." [R. at 322].

## II. History After Disability Claim

Belegrin first filed for disability in July, 2003. In December, 2003, Dr. Welch reported that Belegrin's blood pressure was not under control. Dr. Welch noted that Belegrin complained that "when he works he feels pounding in his head. He gets easily short of breath and tired during the day. He hasn't had much in the way of chest pain but when he feels the pressure go up, he gets anxious and tense because of that." [R. at 317].

Along with his occasional mild chest discomfort, Belegrin suffered from, and was treated for, diabetes, sleep apnea and Meniere's disease. Belegrin was diagnosed with kidney cancer and

3

underwent a right nephrectomy in 2006. He recovered normally and has not has any recurrence. [R. at 19-32].

Dr. Sherman began treating Belegrin for anxiety and depression in April 2006. On April 28, 2006, Dr. Sherman noted that Belegrin reported depression dating back to his heart attack, and that Belegrin stated that Dr. Welch put Belegrin on disability. Belegrin seemed to Dr. Sherman to be logical and goal-oriented, and his cognitive functions seemed intact, with some lower concentration and irritation. Belegrin denied suicidal ideas to Dr. Sherman. Dr. Sherman noted that Belegrin did not seem to have bipolar disorder. [R. at 517-523].

On June 19, 2006, Dr. Sherman met with Belegrin and his wife, Carol. Carol reported that Belegrin was irritable, but that "everything is great if things are going his way." [R. at 524]. She added that he had lost interest and seemed sad. On July 24, 2006, Belegrin reported that he was "starting to have a few better days, finally."*Id.*

On August 16, 2006, Dr. Sherman completed a mental residual functional capacity assessment for Belegrin. The assessment consisted of 20 boxes to check to indicate limitations on mental activity, and a narrative section. Dr. Sherman reported that Belegrin was markedly limited in performing detailed tasks, maintaining attention and concentration, sustaining an ordinary routine, working with others, completing a normal workday or workweek, interacting with the public, responding to changes and setting goals independently. Dr. Sherman wrote in the narrative section only that "Patient's mental condition/personality deteriorated after heart attack and dx of diabetes and liver cancer." [R. at 512-516].

On September 6, 2006, Belegrin reported no success on Wellbutrin and fleeting suicidal ideas, with no plans and no danger. [R. at 525]. On September 25, 2006, Belegrin reported that

though he still had no energy or ambition, he "fe[lt] a little better." [R. at 588]. On October 23, 2006, he told Dr. Sherman that though he had not experienced any "real changes" on the medication, he "d[idn't] think he need[ed] a counselor." *Id.* December 2006, Belegrin reported an incident at a restaurant in which he had backed into a pole while "in a rage." *Id.*

In March 2007, Belegrin reported that the medication "seem[ed] to be helping a tiny bit." [R. at 587]. In June 2007, Belegrin reported that he was still unhappy and lacking ambition. *Id*. In July 2007, Belegrin reported that medication might be helping a little bit and he had "been doing a lot more." *Id.* In September 2007, he reported that an extra dose of Cymbalta "didn't do much," but that he was having no suicidal ideas. *Id.* In January 2008, Belegrin reported that Cymbalta "help[ed] a bit," and again denied any significant suicidal ideas or intent. [R. at 658]. In January 2008, Belegrin reported that the medication was making "a little difference—some days not so down," and Dr. Sherman noted that he "adamantly" denied any serious suicidal ideas. *Id*. In March 2008, Belegrin continued to deny any suicidal ideas, and reported being "maybe a little better" on medication. *Id.* In June 2008, Belegrin reported "hanging in there," with occasional good days and no suicidal thoughts. [R. at 657].

In August 2008, Dr. Sherman wrote a letter to Belegrin's attorney in which he noted that medication had "at least reduced [Belegrin's] suicidal ideas (which had been intense early in treatment)." [R. at 655]. Dr. Sherman added that it was his medical opinion that Belegrin's psychiatric symptoms by themselves were sufficient to render him disabled, and indicated that a description of those symptoms was included in Dr. Sherman's treatment notes. *Id.*

### III. Testimony

### A. August 17, 2005 [R. at 747]

Belegrin testified that he stopped working in 2003 after having a heart attack. He said his cardiologist advised him to stop working, and engaging in activities like cutting the grass or lifting anything over five pounds. Belegrin testified that he has dizzy spells from his Meniere's disease. He testified that he cooks basic meals, but does not engage is other exertional housework. Belegrin also explained that he does not sleep well due to sleep apnea.

Belegrin testified that he takes Xanax and lexapro for anxiety and depression, from which he had suffered for many years. He stated that he had stopped taking Zoloft after hearing bad things about it. Belegrin testified that his symptoms go back to the years when he was working. He stated that he finds pressure situations difficult. Belegrin added that he did not think that he needed a psychological evaluation or any individual psychotherapy or counseling. He testified that the Xanax works "pretty good", and that he had not been taking the Lexapro for long enough to know whether it would have an effect. [R. at 759].

Belegrin explained that when he was working as a bricklayer, his depression and anxiety interfered with his job by forcing him to "lose it and have to walk away." [R. at 760]. He stated that since he stopped working, his depressive symptoms make it difficult for him to deal with big groups of people, though he still has contact with his very close friends. When asked how his symptoms affect his contact with strangers, Belegrin replied, "Well, I just handle it." [R. at 761].

Belegrin testified that if he gets frustrated with a difficult task, he will walk away and his friends will help him collect himself. If he becomes anxious, he stated that he has difficulty breathing, becomes sweaty, and has chest pains.

**B. August 21, 2008 [R. at 773]**

Belegrin testified that he had worked as a bricklayer, but after he had a heart attack his doctor told him not to go back to work. Belegrin stated that his physical limitations prevented him from working. He testified that after he stopped working he began to suffer from severe depression, mood swings and anxiety.

Belegrin testified that he is able to dress himself, but does not cook or clean. He explained that he is capable of driving short distances to run errands. He occasionally visits with his brothers.

He said that he rarely leaves his home and has trouble relating to others. Belegrin testified that he first became depressed after his heart attack because both of his parents died young of cardiac problems, and he was scared that he might suffer the same fate. He said that he had panic attacks in the past, but that they had gradually worsened after his heart attack and cancer diagnoses.

Belegrin testified that though he had always had trouble being around other people, his discomfort has gotten worse in the last ten years. He explained, however, that he did not seek treatment until 2006, when his wife threatened to leave him, and he became suicidal. Belegrin said he began to see Dr. Sherman and continued to see him once a month. Belegrin testified that Dr. Sherman prescribed medication, but that Belegrin had not found the drugs very helpful. Belegrin stated that he suffers from anger, panic and mood swings. Belegrin added that he had been diagnosed with ADHD, which had troubled him in school and made it difficult to remember things. He explained that he would become angry at work if something was complicated. He testified that he was not in special education classes in school.

Belegrin testified that he often takes Ambien before sleeping. He said that he sometimes goes two or three days without sleep, or will sleep eighteen or twenty-four hours straight. When he has difficulty sleeping, he stated that he watches television or talks to his bird.

**Standard for Disability**

To determine disability, the ALJ engages in a sequential, five-step evaluative process. 20 C.F.R. § 404.1520. The ALJ considers whether: 1) the claimant is engaged in work that constitutes substantial gainful activity; 2) the claimant is severely impaired; 3) the claimant's impairment meets or equals the Secretary's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App. 1; 4) claimant can perform past relevant work; and 5) other jobs exist in significant numbers to accommodate claimant if claimant cannot perform his past relevant work, given his residual functional capacity (RFC), age, education and past work experience. *Id.* The claimant bears the burden of proof at steps one through four, after which the burden shifts to the Commissioner at step five. *Id.* at § 404.1520(a)(4). The claimant must provide evidence of functional limitations, not simply diagnosis of an impairment. 20 C.F.R. § 404.1512(c).

**ALJ Findings**

The ALJ found that, in sum, [R. at 13-38]:

1) Belegrin met the insured status requirements of the SSA through December 31, 2007;

2) Belegrin had not engaged in substantial gainful activity at any time relevant to this decision;

3) Belegrin had impairments that at least in combination are severe.

4) Belegrin had impairments that do not meet or medically equal any impairment listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526);

5) Belegrin is not fully reliable, due to inconsistencies in his testimony.

6) Belegrin had the RFC to perform a restricted range of work not requiring more than occasional lifting of ten pounds and five pounds frequently, with an option to sit or stand while working, and no more that 50% of the work day to be spent standing or walking, with no extreme postures more than occasionally, in a normal retail environment. Belegrin could not work in hazardous conditions or around dangerous machinery, and could not perform

work that imposed close regimentation of production or intense contact with the public or strangers.

7) Belegrin was unable to perform past relevant work;

8) Belegrin was a "younger individual" at the time of his alleged onset of disability, and on his date last insured;

9) Belegrin had at least a high school education and is able to communicate in English;

10) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules provide a framework for concluding that Belegrin was not disabled, whether or not he has transferable job skills;

11) there are jobs in the national economy that Belegrin can perform;

12) Belegrin was not under a "disability" as defined by the SSA from March 1, 2003, through December 31, 2007.

**Standard of Review**

When reviewing the Magistrate's Report, I make a de novo determination regarding the portions to which Belegrin objects. *See* 28 U.S.C. § 636(b)(1).

In reviewing the Commissioner's decision, I must determine whether substantial evidence supports the ALJ's findings, and whether the ALJ applied the proper legal standards. 42 U.S.C. § 405(g); *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). I "may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If substantial evidence supports it, I must affirm the ALJ's decision, even if I would have decided the matter differently. 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brainard, supra, 889 F.2d at 681 (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence supports the ALJ's findings, I view the record as a whole, *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir.1980), and consider anything in the record suggesting otherwise. *See Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978).

## Discussion

Belegrin objects to the Magistrate's findings that the ALJ appropriately evaluated: 1) the opinion of Belegrin's treating physician, Dr. Sherman; 2) the opinion of Dr. Deardorff; and 3) the testimony of the Vocational Expert (VE).

### I. Treating Physician

Belegrin first objects to the Magistrate's finding that the ALJ adequately addressed Dr. Sherman's opinion. He argues specifically that the Magistrate incorrectly determined that the adequately articulated reasons for giving no weight to Dr. Sherman's opinion.

The opinions of treating physicians are entitled to greater weight than that given to other medical care providers. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* SSR 96-2p (1996). Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference.*" Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).

The ALJ must give the treating physician's opinion controlling weight if he finds the opinion "well supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). Before he refuses to give a treating source controlling weight, he must consider certain factors—"namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion." *Wilson, supra*, 378 F.3d at 544 (citing 20 C.F.R. § 414.1527(d)(2)).

It is sufficient for an ALJ to state that a treating physician's opinion is: 1) "inconsistent with the overall evidence of record;" and 2) based solely on the claimant's "reporting of her symptoms and her conditions" which the ALJ found not to be credible. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007).

A conclusory medical opinion is not entitled to controlling weight. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." (internal citation and quotation omitted)). The ALJ also need not defer to a physician's determination of whether or not a claimant is disabled. *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

An ALJ must provide "good reasons" for the amount of weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2). These reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. Failure to provide such reasons

"denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers, supra*, 486 F.3d at 243.

Here, the ALJ afforded no weight to Dr. Sherman's 2006 assessment. Dr. Sherman's assessment consisted of a check-box questionnaire. [R. at 512-517]. Dr. Sherman indicated that Belegrin was markedly or moderately limited in several areas. In the narrative section, Dr. Sherman wrote only that Belegrin's "mental condition/personality severely deteriorated after heart attack and diagnosis of diabetes and liver cancer." [R. at 516]. Belegrin argues that the ALJ erred in determining what weight to afford Dr. Shermans's 2006 assessment by relying primarily on Belegrin's global assessment of functioning (GAF) score of 60, and on Dr. Sherman's treatment notes showing that Belegrin was reporting "better days" in July 2006. [Doc. 21, at 2].

The ALJ did not, however, rely primarily on the GAF score or Dr. Sherman's July 2006 treatment note. Instead, the record shows that the facts on which the ALJ relied included that: 1) the evidence showed that Belegrin was suffering from depression and anxiety from 1999-2003, while maintaining regular, full-time work activity; 2) Belegrin was not on medication for depression from 2003-2005, and did not seek psychiatric referral until 2006; 3) at the time of the assessment, Dr. Sherman had only treated Belegrin for a period of a few months—meaning that Dr. Sherman's opinion would be based solely on Belegrin's self-reporting and not objective observation; 4) the ALJ found Belegrin's self-reporting to be unreliable, in part based on inaccuracies in his description of his 2003 heart attack and medical advice at that time; 5) Belegrin maintained hobbies such as hunting, fishing, and taking care of 200 bonsai trees; and 6) Belegrin repeatedly denied suicidal ideation, and only once reported fleeting suicidal ideas. [R. at 31-32]. The ALJ also noted that Dr. Sherman's assessment was inconsistent with his own treatment notes (for example, that Belegrin

reported "better days" in July 2006) and with Dr. Sherman's own April 2006 assignment of the GAF score of 60—indicating only moderate symptoms, with a score of 61 falling in the mild range. [R. at 32]. I find that substantial evidence supports the ALJ's decision to afford no weight to Dr. Sherman's 2006 assessment.

The ALJ gave Dr. Sherman's August 2008 letter limited weight, in part due to the fact that the letter was written well after Belegrin's date last insured. The ALJ also noted inconsistencies between the letter and Dr. Sherman's own treatment notes; Dr. Sherman erroneously stated in the letter that Plaintiff had intense suicidal ideas early on in treatment but his treatment notes only cite to one instance, in September, 2006, when Belegrin indicated suicidal ideas which were described as "fleeting" and with "no plans-no danger." [R. at 589, 655]. In fact, Dr. Sherman's treatment notes reflect that Belegrin repeatedly, and even adamantly, denied suicidal ideas or intent. [R. 499, 500, 525, 657, 658].

The Magistrate correctly found that substantial evidence supports the ALJ's decision to afford limited, if any weight to Dr. Sherman's 2006 and 2008 assessments. With regard to Belegrin's capacity for work, the ALJ was not required to defer to Dr. Sherman's opinion that Belegrin could not work. *See Bass, supra*, 499 F.3d at 511; 20 C.F.R. § 404.1527(e)(2) (stating that "the final responsibility for deciding [a claimant's RFC] is reserved to the Commissioner"); SSR 96-5p (describing issues reserved for Commissioner's determination). While Belegrin is correct that the ALJ must not "substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record," [Doc. 21, at 6], the ALJ here thoroughly considered relevant evidence and arrived at an RFC determination. The ALJ's gave sufficiently specific reasons for his

13

decision to give little weight to Dr. Sherman's opinion, as required by SSR 96-2p. *See also, Smith*, *supra*, 482 F.3d at 877; 20 C.F.R. § 404.1527(d)(2).

Finally, the ALJ found that Belegrin was not entirely credible. Belegrin does not dispute this determination. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p. Because the ALJ found Belegrin was not credible, he could reasonably attribute less weight to Dr. Sherman's opinion when he found that Dr. Sherman's opinion was based in large part on Belegrin's subjective report of symptoms—especially with respect to the relevant period. The ALJ's decision is "reasonable and supported by substantial evidence in the record" and I therefore defer to it. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also* SSR 96-7p (noting that inconsistent statements may cast doubt on credibility).

## II. Non-Treating Physician

Disagreeing with the Magistrate Judge, Belegrin argues that the ALJ's analysis of Dr. Deardorff's opinion was not supported by substantial evidence. Belegrin argues specifically that the ALJ should not have considered the fact that Belegrin's wife stated that Belegrin was "fine around people he knows" as evidence that Belegrin did not have a marked impairment in social functioning." [Doc. 21, at 5].

Dr. Deardorff found that Belegrin had a marked limitation in his ability to relate to others because he was uncomfortable dealing with the examiner, had few friends, rarely left his home, and generally avoided people. [R. at 625]. However, responsibility for assessing RFC rests with the ALJ. 20 C.F.R. § 404.1546(c). Plaintiff acknowledges, the other evidence in the record that supports a finding that Belegrin was not markedly impaired, including the fact that 1) no other examiner

14

reported that Belegrin had difficultly interacting with them; 2) that Belegrin had reported trips to his hunting cabin and at least one trip to a restaurant; 3) that Belegrin was able to maintain a relationship with his wife and visited with his brothers. [R. at 34]. Belegrin also reported that he was easily distracted and angered as a child, and remains so as an adult, which weighs against finding a disability during the relevant period. [R. at 621].

Additionally, the ALJ found Belegrin not to be reliable, and noted inaccuracies and inconsistencies in his testimony to Dr. Deardorff. For example, Belegrin related that he was disabled due to his cardiac condition—which his cardiologist contests; that he had suicidal thoughts and a previous suicide attempt—which he denied in his visit with Dr. Sherman the prior week; and that he had manic-like episodes—though Dr. Sherman specifically ruled out bipolar disorder symptoms. [R. at 33-34].

Social Security Ruling 96-6p provides:

[T]he opinions of State agency medical . . . consultants . . . can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency.

The ALJ conducted a thorough analysis of the evidence and determined that Belegrin had an RFC to perform a restricted range of work not requiring close regimentation of production or intense contact with the public or strangers. [R. at 18].

Belegrin argues that the Magistrate Judge and ALJ did not explain how the mental limitations that the ALJ adopted on a "closely regimented pace of production and close and critical supervision" corresponded to the marked limitation in handling stress found by Dr. Deardorff. [Doc.21 at 6]. However, the ALJ afforded only "some weight" to Dr. Deardorff's finding. The ALJ noted that Dr. Deardorff's opinion—that stress could lead to "manic behavior"—was unsupported

15

by the record because Dr. Sherman ruled out bipolar symptoms and because Belegrin reported only rare use of Xanax. Dr. Deardorff was a one-time examining agency physician who examined Plaintiff four months after his date last insured. Moreover, the ALJ accommodated any work stress limitation by adjusting Plaintiff's MRFC to restrict him to jobs that do not require a "closely regimented pace of production and close and critical supervision." [R. at 36].

I therefore find that the ALJ did not err in affording limited weight to Dr. Deardorff's report and that the ALJ's RFC determination is supported by substantial evidence.

## II. Vocational Expert Testimony

In his testimony regarding work available for Belegrin, the VE stated that "other work given the hypothetical would be based upon a sedentary, unskilled occupational base and positions that would apply would include bench worker, 250, assembler, 250 and break lining coater, 250." [R. at 794]. The ALJ, in his opinion, found that the VE identified "representative occupations." Belegrin argues that the Magistrate erred in finding that the VE's testimony could be construed as identifying representative occupations. However, the VE's testimony is consistent with the ALJ's conclusion that the jobs identified by the VE were merely representative examples. [R. at 37]. Even if the jobs were not representative, as the Magistrate noted, the number of jobs identified by the VE is sufficient evidence for an ALJ to determine that work existed in significant numbers that Plaintiff could perform. *See e.g. Girt v. Astrue*, No. 9-1218, 2010 WL 908663 at *4 (N.D.Ohio, Mar. 12, 2010) (collecting cases).

**Conclusion**

ORDERED THAT:

1. Plaintiff's objections to the Report and Recommendation of the United States Magistrate Judge be, and the same hereby are, overruled; and

2. The Report and Recommendation of the Magistrate Judge be, and the same hereby are adopted as the Order of the undersigned.

The Clerk shall enter judgment accordingly.

So ordered.

s/James G. Carr<br>U.S. District Judge